PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

VINCENT D. DIFELICE, on behalf of
himself and all others similarly
situated,

    *Plaintiff-Appellant,*

    v.

U.S. AIRWAYS, INCORPORATED,

    *Defendant-Appellee,*

    and

FIDELITY MANAGEMENT TRUST
COMPANY,

    *Defendant.*

No. 06-1892

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(1:04-cv-00889-TSE)

Argued: March 16, 2007

Decided: August 1, 2007

Before MOTZ and SHEDD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Shedd and Senior Judge Hamilton joined.

---

## COUNSEL

**ARGUED:** Walter H. Fleischer, McLean, Virginia, for Appellant.
Christopher Alan Weals, MORGAN, LEWIS & BOCKIUS, L.L.P.,

Washington, D.C., for Appellee. **ON BRIEF:** Ellen M. Doyle, Richard A. Finberg, James A. Moore, Joel R. Hurt, MALAKOFF, DOYLE & FINBERG, P.C., Pittsburgh, Pennsylvania, for Appellant. Charles C. Jackson, James E. Bayles, Jr., Julia Y. Trankiem, MORGAN, LEWIS & BOCKIUS, L.L.P., Chicago, Illinois, for Appellee.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

In August 2002, following a period of severe financial stress exacerbated by the September 11th attacks, U.S. Airways, Inc. (U.S. Airways), the principal operating subsidiary of U.S. Airways Group (Group), filed for relief under Chapter 11 of the Bankruptcy Code. As a consequence, all Group stock was cancelled without distribution to stockholders. Vincent DiFelice then brought this action seeking recovery under the Employee Retirement Income Security Act of 1974 (ERISA) on behalf of U.S. Airways employees (the Employees) who held Group stock from October 1, 2001 to June 27, 2002 through a U.S. Airways 401(k) plan. The district court certified a class, permitting DiFelice to represent these employees, and, after a bench trial, granted judgment to U.S. Airways. *DiFelice v. U.S. Airways, Inc.*, 436 F. Supp. 2d 756 (E.D. Va. 2006). For the reasons explained within, we affirm.

### I.

In support of its legal conclusions, the district court set forth 132 detailed factual findings. *See id.* at 756-81. We summarize below only those findings necessary to a resolution of the Employees' contentions on appeal.

### A.

Throughout the class period, U.S. Airways maintained a defined contribution § 401(k) plan for qualified employees, administered through a trust agreement (collectively the Plan). *See* 26 U.S.C. § 401(k) (2000); 29 U.S.C. § 1002(34) (2000). U.S. Airways, the

named administrator of the Plan for tax and ERISA purposes, delegated its duties to the Pension Investment Committee (PIC), a group of high-ranking company officers, including the Chief Financial Officer, who reported, through the Human Resources Committee of the Board of Directors, to the full Board. The PIC, which had both the responsibility and the authority to make decisions regarding investment options under the Plan, met regularly to review the performance of the Plan's investment options and to confer with outside financial advisors and investment consultants. During the nine-month class period, the PIC held several informal meetings and four formal meetings, at which it circulated agendas and written materials.

U.S. Airways intended the Plan "'to provide retirement income'" and "'to operate for the exclusive benefit of eligible employees and their beneficiaries.'" *DiFelice*, 436 F. Supp. 2d at 759 (*quoting* Plan documents). The Plan "permitted participants to contribute up to 15% of their salaries . . . on a pre-tax basis," *id.*; U.S. Airways matched certain employee contributions up to a specified level. Each employee who chose to invest through the Plan had his own individual account; the balance in a participant's account consisted of his contributions and any matched funds, "plus any earnings and less any losses or allocated expenses." *Id.*

The Plan granted U.S. Airways the authority to "'determine the number and type of Investment Funds and select the investments for such Investment Funds.'" *Id.* at 760 n.5 (*quoting* Plan document). "'[I]n its discretion,'" U.S. Airways could "'terminate any . . . Investment Fund.'" *Id.* at 760 (*quoting* Plan document). The Plan stated that the menu of Investment Funds could, but need not, include a Fund consisting of Group stock. If the Plan did include such a Fund, it required that U.S. Airways "'continually monitor the suitability . . . of acquiring and holding Company Stock.'" *Id.* (*quoting* Plan document).

During the class period, the Plan offered twelve diversified Investment Funds, including a money market fund, a fixed income fund, various mutual funds, and several diversified portfolio funds. The Plan also offered a Company Stock Fund ("Company Fund"), which held Group stock and sufficient cash to meet transfer and payment needs, usually amounting to approximately 10% of Fund assets.

Within this thirteen-Fund menu, participants had an almost unlimited ability to allocate their investments.[1] Even after participants had elected to invest in a particular Fund or Funds, they could transfer any prior investments, and direct any new investments, to other Plan Funds. In this way, the onus was on the participants to manage their investments.

U.S. Airways, however, did provide participants with a Summary Plan Document (SPD), as well as other brochures and pamphlets, which provided general information about the Plan's mechanics, descriptions of the various Fund options, and specific warnings about the Company Fund. The materials identified the Company Fund as the riskiest, most volatile offering, and stated that investment in this Fund was appropriate for "'[s]omeone who does not rely on this fund for his/her entire portfolio.'" *Id.* at 765 (*quoting* Plan document). At least two Plan brochures included a graphic showing the thirteen investment options on a spectrum from lower risk and lower return potential to higher risk and higher return potential; the graphics showed the Company Fund as the highest risk (and highest return potential) Fund. These materials explained that this was so because "'[i]nvesting in a non-diversified single stock fund involves more risk than investing in a diversified fund.'" *Id.* (*quoting* Plan document).

In the same vein, the Plan literature emphasized the importance of spreading investment dollars among three basic asset types — stocks, bonds, and short-term investments — and among three basic strategies — growth, income, and preservation of principal — in order to minimize the risk of significant losses in one particular investment or investment type. The SPD informed participants that U.S. Airways did not "'guarantee the performance of the [Company] Fund," *id.* at 765, or any other Fund, and that participants alone were responsible for any losses which resulted from their Plan selections. The SPD also stated, in bold print, that Plan participants should consider seeking professional advice when deciding how to allocate their contributions.

---

[1]The most significant restrictions on participant choice limited investment in the *Company* Fund: "matched" funds provided by U.S. Airways could not be invested in the Company Fund, and a participant who removed funds from the Company Fund could not thereafter reinvest in the Company Fund for 30 calendar days

## B.

Throughout the class period, U.S. Airways remained an embattled company "facing serious hurdles, with its long-term success, and indeed viability, in doubt." *Id.* at 766. Even before the attacks of September 11th, U.S. Airways confronted liquidity problems. Plans for a merger with United Airlines ended after the Department of Justice indicated its intent to file a lawsuit to block the merger. U.S. Airways then announced a three-phase restructuring plan, through which it hoped to reduce costs and improve its financial position.

The company's situation declined markedly after September 11, 2001. Although all airlines struggled then, U.S. Airways faced particular challenges. It had the highest cost structure of any major United States airline, confronted significant competitive threats from low-fare carriers in its primary markets, and suffered from a decrease in what had been substantial operations at Ronald Reagan National Airport in Washington, D.C. On September 10, 2001, the Group stock price closed at $11.62 per share. In the days after the September 11th attacks, Group stock never closed lower than $4.10 per share, its closing price on September 27, 2001. By October 1, 2001, the share price had rebounded very slightly to $4.48. The value of the Company Fund decreased in similar fashion over the same period.

During the class period, October 1, 2001 to June 27, 2002, U.S. Airways implemented cost-cutting measures, for example, reducing its workforce and using more regional jet and turbo-prop aircraft. It also sought to ease liquidity concerns by borrowing against its fleet and requesting government assistance. At the end of the 2001 calendar year, the Group stock price had rebounded to $6.34 per share. In early 2002, market analysts took a "wait-and-see" approach to Group stock, with all nine analysts covering the stock recommending a "Hold." By April 2002, U.S. Airways recognized that cost-cutting would not generate sufficient liquidity for its survival and the company announced that it would seek government assistance from the Air Transportation Stabilization Board (ATSB) as well as concessions from key stakeholders. Despite this news, in mid-April, the Group stock price was largely unchanged from four months earlier, trading at $6.25 per share on April 15th.

Over this same seven-month period — from September 2001 to April 2002 — as U.S. Airways's financial situation, and liquidity, generated both cautious optimism and cause for concern, the PIC not only met internally, but also sought outside advice from U.S. Airways's Associate General Counsel, and later from outside legal counsel, about whether it should retain the Company Fund as an option under the Plan. All parties — the PIC, the Associate General Counsel, and the outside legal counsel, O'Melveny & Myers, LLP — believed it unnecessary, at that time, to cease offering the Company Fund. The Human Resources Committee of the Board of Directors and, later, the full Board considered and approved the PIC's decision to retain the Fund.

In May 2002, U.S. Airways filed a required Form 10-Q with the Securities and Exchange Commission, which indicated that although U.S. Airways believed it could restructure successfully with liquidity assistance from the government, a judicial reorganization was also a possibility. Around the same time, the PIC recommended the appointment of an independent fiduciary to assume U.S. Airways's duties vis-a-vis the Company Fund. In a special meeting on May 9, 2002, the Board of Directors voted to retain an independent fiduciary for the Company Fund and authorized prompt steps to retain one. U.S. Airways solicited proposals from third parties and on June 3, 2002 — the first business day after receiving a summary of those proposals — the PIC formally met and selected an independent fiduciary. By June 27, 2002, after an initial false start, U.S. Airways had retained Fiduciary Counselors, an independent third-party, to serve as an independent fiduciary for the Company Fund and had notified participants of this selection.[2] This marked the end of the class period, which had begun on October 1, 2001. At this point, the stock price was $3.72 per share.

Once appointed, Fiduciary Counselors moved immediately to increase the cash component of the Company Fund from 10% to 20%, which required selling some Group stock. Shortly thereafter, on July

_____

[2]In testimony at trial, the President and CEO of Fiduciary Counselors testified that she did not know of any other situation outside the Employee Stock Ownership Plan (ESOP) context in which an internal company fiduciary had appointed an independent fiduciary in connection with a company stock fund.

3, 2002, Fiduciary Counselors halted the purchase of additional shares of Group stock for the Company Fund, although it continued to allow participants to move freely in and out of the Company Fund.

By July 10, the ATSB had approved U.S. Airways's application for a loan guarantee, conditioned on U.S. Airways obtaining significant concessions from its employees and creditors. U.S. Airways was unable to obtain these concessions, and so the company voluntarily filed for bankruptcy on August 11, 2002. On that date, Fiduciary Counselors directed that the Company Fund be closed.

Fiduciary Counselors transferred the cash remaining in the Company Fund to the Plan's money market Fund, from which participants could direct their monies to any of the other Plan options. On December 20, 2002, Fiduciary Counselors advised participants that existing Group stock would be cancelled and stockholders would receive no distribution under the Plan. This suit followed.

## C.

During discovery, the district court certified a class, *DiFelice v. U.S. Airways*, 235 F.R.D. 70, 83 (E.D. Va. 2006), a ruling not challenged on appeal. The court then held a six-day bench trial, at which eleven fact witnesses and five experts testified on behalf of the Employees and two experts testified on behalf of U.S. Airways. The parties also designated portions of depositions of ten additional witnesses and submitted roughly two hundred documentary exhibits to the court. Approximately one month after conclusion of the trial, the district court issued a comprehensive 58-page memorandum opinion, granting judgment to U.S. Airways. *See DiFelice*, 436 F. Supp. 2d at 756, 758. The Employees appeal, challenging the district court judgment on several grounds. Before addressing these contentions, we briefly outline the governing legal principles.

## II.

ERISA, a "comprehensive and reticulated statute," governs employee benefit plans, including retirement plans. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993) (internal quotation marks omitted).

It is intended to "promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). Under ERISA, plan fiduciaries "are assigned a number of detailed duties and responsibilities, which include the proper management, administration and investment of plan assets, the maintenance of proper records, the disclosure of specific information, and the avoidance of conflicts of interest." *Mertens*, 508 U.S. at 251 (internal quotation marks and alterations omitted). These duties and responsibilities "draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment." *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996). The common law of trusts, therefore, "will inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties." *Id.* at 497.

The parties agree that during the class period the Plan authorized U.S. Airways to act as Plan fiduciary with discretion to select investment options and a duty to monitor their continued suitability. They also agree that U.S. Airways permissibly exercised that discretion to provide Plan participants the option of investing in a Company Fund.

ERISA requires that a fiduciary shall act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B) (2000). It also requires that a fiduciary "shall discharge his duties . . . solely in the interest of the participants and beneficiaries." *Id.* § 1104(a)(1).[3] Thus, in common

---

[3]Although the Plan comported with section 404(c) of ERISA, which *limits* the liability of fiduciaries for actions undertaken as a direct result of investment instructions given by participants, *see* 29 U.S.C. § 1104(c), this safe harbor provision does not apply to a fiduciary's decisions to select and maintain certain investment options within a participant-driven 401(k) plan, *see Final Regulation Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans)*, 57 Fed. Reg. 46906, 46924 n.27 (Oct. 13, 1992). Rather, "limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA 404(c) plan is a *fiduciary function*," *id.* at 46924 n.27 (emphasis added), and "responsible plan fiduciaries are . . . subject to

parlance, ERISA fiduciaries owe participants duties of prudence and loyalty. *Moench v. Robertson*, 62 F.3d 553, 561 (3d Cir. 1995). To enforce these duties, "the court focuses not only on the merits of [a] transaction, but also on the thoroughness of the investigation into the merits of [that] transaction." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996). Good faith does not provide a defense to a claim of a breach of these fiduciary duties; "a pure heart and an empty head are not enough," *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

But ERISA fiduciaries owe these duties only when they are acting in their capacity as a fiduciary. An ERISA fiduciary is only "a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . [or] has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A) (2000). In other words, we apply a functional analysis in determining if a party acts as a fiduciary and owes fiduciary duties with regard to particular conduct. *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

Unquestionably, fiduciaries must exercise prudence in administering a plan. A fiduciary like U.S. Airways — that is, a fiduciary of a

---

ERISA's general fiduciary standards in initially choosing or continuing to designate investment alternatives offered by a 404(c) plan," Letter from the Pension and Welfare Benefits Administration, U.S. Dep't. of Labor, to Douglas O. Kant, 1997 WL 1824017, at *2 (Nov. 26, 1997). *Accord Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 320 (5th Cir. 2007) (Reavley, J., dissenting on other grounds); *In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861 (S.D. Tex. 2004) (holding that plaintiffs state a claim against fiduciaries by alleging a failure to eliminate a particular fund as an investment option within a 404(c) plan); *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 578 (S.D. Tex. 2003). In other words, although section 404(c) does limit a fiduciary's liability for losses that occur when participants make poor choices from a satisfactory menu of options, it does not insulate a fiduciary from liability for assembling an imprudent menu in the first instance.

defined contribution, participant-driven, 401(k) plan created to provide retirement income for employees who is given discretion to select and maintain specific investment options for participants — must exercise prudence in selecting and retaining available investment options. In determining whether U.S. Airways has done so here we examine the totality of the circumstances, including, but not limited to: the plan structure and aims, the disclosures made to participants regarding the general and specific risks associated with investment in company stock, and the nature and extent of challenges facing the company that would have an effect on stock price and viability.

Fiduciaries must also scrupulously adhere to a duty of loyalty, and make any decisions in a fiduciary capacity with "an eye single to the interests of the participants and beneficiaries." *Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995) (internal quotation marks omitted). Any fiduciary who wears two hats — e.g., by virtue of being a plan fiduciary as well as a corporate officer — must "wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225. Corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

The district court concluded that U.S. Airways fulfilled its duties as a fiduciary, by acting both prudently and with loyalty toward the Plan participants. The Employees, however, challenge the district court's judgment on a variety of grounds. All are meritless, and many, given the thoroughness of the district court opinion, require no discussion. But in light of the importance of this case and the lack of precedent in the field, we address the Employees' primary challenges to the district court's findings and then to its methodology. We review the factual findings of the district court for clear error, and its legal conclusions *de novo*. *Roanoke Cement Co. v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005).[4]

---

[4]Relying on *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), U.S. Airways maintains that the district court should have evalu-

III.

The Employees contend that in its factual findings the district court failed to give adequate consideration to the Employees' evidence of U.S. Airways's precarious financial position during the class period. Furthermore, according to the Employees, the company's economic peril rendered its decision to offer the Company Fund to Plan participants a violation of its fiduciary duties to select and hold prudent investments and to monitor those investments prudently. The Employees also assert that the district court erred in failing to find that, in offering the Company Fund during the class period, U.S. Airways acted under an improper conflict of interest.

A.

First, the Employees take issue with the district court's failure to accept the mathematical model proffered by one of their expert witnesses, a model they allege "predicted a high probability of U.S. Airways's imminent bankruptcy." Br. of Appellants at 42. The district court, however, explicitly considered this testimony and the proffered model, but found that it was "not generally relied upon by fiduciaries determining the bankruptcy risk of an investment in an individual security." *DiFelice*, 436 F. Supp. 2d at 785. Furthermore, the court found contrary facts — e.g., neutral recommendations from investment analysts with regard to Group stock and bond ratings that were bleak, but not dire — compelling and concluded that the market

ated its fiduciary actions under a more deferential standard. Courts have not been entirely consistent in deciding whether to apply *Firestone* deference in cases similar to that at hand. *See Armstrong v. LaSalle Bank Nat. Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006) (noting inconsistency and collecting cases). This is due, in part, to the Supreme Court's explicit statement in *Firestone* that its discussion of the appropriate standard of review was limited to actions under 29 U.S.C. § 1132(a)*(1)(B)*. 489 U.S. at 108 ("We express no view as to the appropriate standard of review for actions under other remedial provisions of ERISA."). Here, by contrast, the Employees bring their cause of action under 29 U.S.C. § 1132(a)*(2)* and *(3)*. Because we find that the challenged actions of the fiduciary survive review under the usual standards, we need not determine here the applicability of the more deferential *Firestone* standard.

agreed that there was a substantial chance that U.S. Airways could avoid bankruptcy. The district court's resolution of these evidentiary disputes provides no basis for finding clear error.

B.

As a more general matter, the Employees contend that the district court erred in finding that U.S. Airways met its fiduciary duty to hold only prudent investments over the class period. The Employees principally argue that U.S. Airways insufficiently monitored the performance and prospects of the Company Fund, and therefore failed to act "with the care, skill, prudence, and diligence" that a "prudent man" would employ. 29 U.S.C. § 1104(a)(1)(B). The Employees' claim appears to be that had U.S. Airways acted prudently, it would have removed the Company Fund as an option for investment at some point during the class period.

When deciding whether a plan fiduciary has acted prudently, a "[c]ourt must inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001) (internal quotation marks omitted). In other words, a court must ask whether the fiduciary engaged in a reasoned decisionmaking process, consistent with that of a "prudent man acting in like capacity," 29 U.S.C. § 1104(a)(1)(B). A similar inquiry must take place when plaintiffs allege, as the Employees do here, that a fiduciary's *failure* to engage in a transaction, such as removal or closure of a company fund, breaches a duty. *Cf. Kuper*, 66 F.3d at 1459 ("A fiduciary may breach his duties to plan beneficiaries by failing to investigate and evaluate the merits of his investment decisions."). In this situation, a fiduciary has an obligation to use "appropriate methods to investigate the merits" of removing a plan option such as an employer stock fund. The evaluation is not a general one, but rather must "depend[ ] on the character and aim of the particular plan and decision at issue and the circumstances prevailing at the time." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000) (internal quotation marks omitted). The district court made numerous findings on each of these points.

The district court found, *inter alia*, that the Plan's purpose was to "'provide retirement income'" for participants. *DiFelice*, 436 F. Supp.

2d at 759 (*quoting* Plan documents). In addition to the Company Fund, U.S. Airways offered twelve diversified, and less risky, alternatives for investment and allowed participants to transfer their investment funds freely between these diversified options, always allowing participants to remove funds from the Company Fund without restriction. The Plan placed no conditions on investment of "matched" funds, except to *disallow* their investment in company stock. *Cf. DiFelice*, 436 F. Supp. 2d at 772 (differentiating U.S. Airways's plan from those involved in the Lucent and Enron suits, which *compelled* investment in company stock). Furthermore, Plan literature repeatedly noted the risks associated with a non-diversified retirement portfolio in general, and the Company Fund in particular; U.S. Airways explicitly informed participants, in words as well as through use of a clear graphic, that the Company Fund carried the highest risk of the available options.

In addition, the district court found that U.S. Airways, through the PIC, monitored the performance of the Company Fund, and evaluated its continued suitability. During the class period, in addition to meeting informally, the PIC met formally four times, and at each of these meetings considered whether to continue to offer the Company Fund. Moreover, on at least two occasions, the PIC sought outside legal opinions with regard to ERISA's fiduciary duty requirements and those outside advisors indicated that it was consistent with the "prudent man" duty to maintain the Company Fund. And, when the company publicly announced that it was considering judicial reorganization as a contingency plan, U.S. Airways appointed an independent fiduciary to ensure that a non-company fiduciary would determine the future of the Company Fund in the Plan. Additionally, U.S. Airways's PIC continued reasonably to believe, throughout the class period, that U.S. Airways had a "credible and viable voluntary restructuring plan with a reasonable chance of success," and that it "would be able to avoid bankruptcy." *DiFelice*, 436 F. Supp. 2d at 779.[5]

---

[5]The Employees argue that a company could always assert that restructuring outside of bankruptcy is a possibility. Even assuming this is so, the district court here explicitly found that the PIC had a *well-founded* belief, during the relevant time period, that U.S. Airways would, in fact, be successful in restructuring and avoiding bankruptcy. *DiFelice*, 436 F. Supp. 2d at 779.

We find no error in these factual findings; indeed we find them unassailable. Based on these facts, the court correctly concluded that U.S. Airways met its fiduciary duty to engage in a reasoned, "prudent" decisionmaking process, using "appropriate methods to investigate the merits" of retaining the Company Fund as an investment option. We stress that U.S. Airways *twice* engaged independent advisors — once during the class period, and once marking its end. *Cf. Armstrong*, 446 F.3d at 734 (questioning whether the fiduciaries ever considered other options). Although plainly independent advice is not a "whitewash," *Bierwirth*, 680 F.2d at 272, it does provide "evidence of a thorough investigation," *Howard*, 100 F.3d at 1489. Similarly, although appointment of an independent fiduciary does not "whitewash" a prior fiduciary's actions, timely appointment of an independent fiduciary, prompted by concerns about the continued prudence of holding company stock under an ERISA plan, does provide some evidence of "procedural" prudence and proper monitoring during the relevant period.

## C.

With respect to the district court's findings as to U.S. Airways's duty of unyielding loyalty, we also conclude that the Employees' claims must fail. *See Griggs v. DuPont DeNemours*, 237 F.3d 371, 380 (4th Cir. 2001).

Under ERISA, it is not fatal that a plan fiduciary has "financial interests adverse to beneficiaries." *Pegram*, 530 U.S. at 225. There is no *per se* breach of loyalty if an "officer, employee, agent, or other representative" of the plan sponsor also serves as a plan fiduciary, even if that fiduciary purchases company securities on behalf of that plan. 29 U.S.C. § 1108(c)(3) (2000); *Cunningham*, 716 F.2d at 1466. Thus, the fact that corporate officers comprised the PIC does not, in and of itself, create an illegal conflict of interest.[6]

---

[6]Mere officer or director status does not create an imputed breach of the duty of loyalty simply because an officer or director has an understandable interest in positive performance of company stock. Nor, contrary to the Employees' assertion, is the fact that retention of company stock could demonstrate an "appearance of confidence" in one's company, Br. of Appellants at 54, sufficient to demonstrate that an officer or director acted under a conflict of interest in retaining that stock.

Beyond the bare allegation of a conflict based on the corporate position of the plan fiduciary, the Employees have provided no evidence that U.S. Airways continued to offer the Company Fund based on anything other than the best interests of the Plan participants — those who had already invested in the Company Fund as well as those who might elect to do so in the future. The district court found no evidence of other indicators of a breach of a duty of loyalty, e.g., that high-ranking company officials sold company stock while using the Company Fund to purchase more shares, or that the Company Fund was being used for the purpose of propping up the stock price in the market. Indeed, the court found that, throughout the class period, the PIC had a "well-founded" belief that the company would avoid bankruptcy. If the PIC had been correct, holding Group stock could have been a very profitable venture and one that would have been in the best interest of participants. Furthermore, if U.S. Airways had closed the Company Fund prematurely, and Group stock had rebounded further, the PIC would have succeeded only in locking in participant losses and *precluding* Plan participants from benefitting from the increase in stock price.

On the basis of these findings, the district court did not err in concluding that the Employees had not demonstrated any breach of the duty of loyalty by U.S. Airways.

## IV.

Finally, the Employees pose more limited legal challenges to the particular methodology employed by the district court in arriving at its conclusion that U.S. Airways did not breach its fiduciary duties under ERISA.

## A.

The Employees principally contend that the district court applied an improper test for determining when a fiduciary may continue to offer company stock in a 401(k) plan. They rely for this contention on the concluding paragraph of the district court's 58-page opinion, in which it stated:

> Thus, a fiduciary may continue to offer employee stock as an investment option in a 401(k) Plan [without breaching any fiduciary duty of prudence] as long as the fiduciary also provides Plan participants, as here, with: (1) a range of investment options; (2) true and accurate information regarding the risk/return characteristics of those investment options; and (3) the unfettered ability to trade in and out of the various investment options.

*DiFelice*, 436 F. Supp. 2d at 789. The Employees argue that this asserted test "eliminates" the ERISA requirement that fiduciaries prudently monitor Plan investments to ensure they offer only prudent options. Br. of Appellants at 36-37.

Although the district court's formulation set forth some appropriate considerations, it does not set forth all of an ERISA fiduciary's duties. ERISA itself sets forth the *only* test of a fiduciary's duties: the requirement that fiduciaries act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Although the district court's concluding formulation did not fully set forth the prudence duty of an ERISA fiduciary, its thorough analysis throughout the opinion contained, and is predicated on, this precise evaluation. *See, e.g.*, *DiFelice*, 436 F. Supp. 2d at 782, 785. Therefore, the incompleteness of the concluding formulation provides no basis for reversal.[7]

### B.

The Employees also assert that the district court's holding "is fatally flawed by its misunderstanding of modern portfolio theory."

---

[7]The Employees alternatively argue that even if a shut-down of the Company Fund would have been imprudent because of the harm to employees invested in the Fund, who would be forced to take a loss on the Group holdings, it was imprudent to allow new contributions in the Company Fund. For the reasons set forth previously, it was neither imprudent to continue to offer the Company Fund, nor to continue to allow new contributions to it.

The district court properly noted that "the portfolio management theory . . . teaches that an investment in a risky security as part of a diversified portfolio is, in fact, an appropriate means to increase return while minimizing risk." *DiFelice*, 436 F. Supp. 2d at 789; *see also* Charles J. Goetz, *Cases and Materials on Law and Economics* 128-29 (1984). Moreover, the court correctly recognized, *DiFelice*, 436 F. Supp. 2d at 789, that modern portfolio theory has been adopted in the investment community and, for the purposes of ERISA, by the Department of Labor. *See* 29 C.F.R. § 2550-404a-1 (directing plan fiduciaries to consider, *inter alia*, "the role [an] investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties").

However, the court may have overstated the appropriate relevance of modern portfolio theory to this case. Standing alone, it cannot provide a defense to the claimed breach of the "prudent man" duties here. "Under ERISA, the prudence of investments or classes of investments offered by a plan must be judged individually." *Langbecker*, 476 F.3d at 308 n.18; *see also In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 438-41 (3d Cir. 1996). That is, a fiduciary must initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants. Here the relevant "portfolio" that must be prudent is *each* available Fund considered on its own, including the Company Fund, not the full menu of Plan funds.

This is so because a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds, which individuals may *or may not* elect to combine with a company stock fund, could theoretically, in combination, create a prudent portfolio.[8] To

---

[8]*Laborers Nat'l Pension Fund v. Northern Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 315 (5th Cir. 1999), cited by the district court in support of its heavy reliance on modern portfolio theory, involves a plaintiff challenging the prudence of one investment, contained within a monolithic, fiduciary-selected portfolio. The court there determined that the defendant fiduciary could properly rely on modern portfolio theory because the fiduciary *himself* consciously coupled risky securities with safer ones to construct one ready-made portfolio for participants. *Id.* at 318, 323; *accord* H.R. Rep. No. 93-1280 (1974), *as reprinted in* 1974 U.S.C.C.A.N. at 5085 (noting that diversification is evaluated by looking

adopt the alternative view would mean that any single-stock fund, in which that stock existed in a state short of certain cancellation without compensation, would be prudent if offered alongside other, diversified Funds. Any participant-driven 401(k) plan structured to comport with section 404(c) of ERISA would be prudent, then, so long as a fiduciary could argue that a participant could, and should, have further diversified his risk. *Cf. Langbecker*, 476 F.3d at 303 (noting "the tension" between fiduciary obligations and participant-directed plans). This result would be perverse in light of the Department of Labor's direction that selection of prudent plan *options* falls within the fiduciary duties of a plan administrator. *See supra* note 3.

Although the district court may have relied too heavily on modern portfolio theory, this reliance in no way affected the validity of its ultimate holding. For the reasons stated earlier, even considered individually the Company Fund was a viable and prudent option for investment over the class period.

V.

At the heart of the Employees' case seems to be the view that, given their losses and U.S. Airways's undisputed knowledge of its uncertain financial condition over the class period, U.S. Airways *must* have violated ERISA's "prudent man" duty when it continued to offer the Company Fund as a Plan option. Although we are not unsympathetic to the Employees' losses, such a contention is not tenable.

First and foremost, whether a fiduciary's actions are prudent cannot be measured in hindsight, whether this hindsight would accrue to the fiduciary's detriment or benefit. *See Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917-18 (8th Cir. 1994) ("[T]he prudent person standard is not concerned with results; rather it is a test of how the fidu-

---

at all investments in a pooled fund). Here, in contrast, modern portfolio theory alone cannot protect U.S. Airways, which offered the Company Fund — an undiversified investment alternative — just because it also offered *other* investment choices that made a diversified portfolio theoretically possible.

ciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight." (internal quotation marks omitted)). Put another way, an investment's diminution in value is neither necessary, nor sufficient, to demonstrate a violation of a fiduciary's ERISA duties.

Furthermore, although placing retirement funds in *any* single-stock fund carries significant risk, and so would seem generally *imprudent* for ERISA purposes, Congress has explicitly provided that qualifying concentrated investment in *employer* stock does not violate the "prudent man" standard per se. *Compare* 29 U.S.C. § 1104(a)(1)(C) (2000) (directing that the general ERISA "prudent man duty" requires a fiduciary to "diversify[ ] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so"), *with* 29 U.S.C. § 1104(a)(2) (2000) (freeing fiduciaries from duty to diversify when they hold company stock as part of a qualified eligible individual account plans (EIAPs)), *and* 29 U.S.C. § 1107(d)(3) (2000) (including Employee Stock Ownership Plans (ESOPs) as qualified EIAPs freed from duty to diversify). We agree with the Employees that the risks of concentration are especially great when the employer stock at issue is volatile or the company's prospects in peril. For in that situation, other, non-investment, losses may accompany any investment loss resulting from a sharp devaluation of employer stock. *Cf. Summers v. State St. Bank & Trust Co.*, 453 F.3d 404, 409 (7th Cir. 2006) (noting the risks involved with tying the future value of one's financial assets to a single company's fortunes, particularly when that company also provides one's salary and fringe benefits).

Of course, the Employees' argument on this point is not novel; our sister circuits and various commentators have recognized it. *See, e.g.*, *Armstrong*, 446 F.3d at 732 ("There is a sense in which, because of risk aversion, an ESOP is imprudent per se, though legally authorized."); *Cunningham*, 716 F.2d at 1466 (noting tension between Congress's encouragement of ESOPs and ERISA's fiduciary duties, the latter of which aim to protect employees' retirement savings); *see also Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992); *Moench*, 62 F.3d at 568; Norman Stein, *Three and Possibly Four Lessons About ERISA That We Should, But Probably Will Not, Learn from Enron*, 76 St. John's L. Rev. 855 (2002) (arguing that participants generally should

not hold employer stock in their retirement plans); Susan J. Stabile, *Freedom To Choose Unwisely: Congress' Misguided Decision To Leave 401(k) Plan Participants to Their Own Devices*, 11 Cornell J.L. & Pub. Pol'y 361 (2002) (suggesting that ERISA overestimates the ability of employee participants to protect themselves when selecting investments under a participant-driven 401(k) plan).

Congress, however, has chosen to follow a "strong policy and preference in favor of investment in employer stock." *Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 956 (D.C. Cir. 1985) (internal quotation marks omitted); *see also Martin*, 965 F.2d at 664 (noting dual purpose of an ESOP as "both an employee retirement benefit plan and a technique of corporate finance that would encourage employee ownership" (internal quotation marks omitted)). Apparently, Congress considered the possible benefits to employees and employers from undiversified investments in employer stock and found them to outweigh the risks inuring from such strategy.

As more employers shift toward participant-driven, defined-contribution plans, and participant-driven 404(c) plans in particular, Congress may reconsider the necessity of more safeguards for participants. For example, ERISA already limits the amount of employer stock that can be held in any defined-benefit pension plan to 10% of total plan assets. 29 U.S.C. § 1107(a)(2) (2000). In light of the losses that have accrued to the Employees here, and others similarly situated, Congress may well decide that a similar limitation is appropriate for participant-driven, non-ESOP, defined-contribution plans. However, this policy decision is one for Congress and not for the courts. *Cf. Summers*, 453 F.3d at 411 ("The time may have come to rethink the concept of an ESOP, a seemingly inefficient method of wealth accumulation by employees because of the underdiversification to which it conduces . . . ."). Accordingly, the Employees cannot succeed in this lawsuit simply by demonstrating that U.S. Airways offered the Company Fund during a time of grave uncertainty for the company, no matter how significant the Employees' ultimate financial losses.

## VI.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*